IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ADAM VASQUEZ, § | |
| § | |
| Plaintiff § | |
| § | |
| v. § | Civil Action No. 3:10-CV-1072-BH |
| § | |
| MICHAEL J. ASTRUE, § | |
| Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated August 9, 2010, this case has been transferred for all further proceedings and entry of judgment. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed October 7, 2010, and *Defendant's Motion for Summary Judgment*, filed November 5, 2010. Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED**, Defendant's motion is **DENIED**, and the case is **REMANDED** for reconsideration.

### I. BACKGROUND[1]

**A.     Procedural History**

Plaintiff Adam Vasquez ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for disability benefits under Title II and Title VI of the Social Security Act. On November 1, 2006, Plaintiff applied for disability insurance benefits and supplemental security income, alleging disability since September

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

1, 2006, due to seizures, head injuries, and sleep apnea. (R. at 139-50, 184.) His application was denied initially and upon reconsideration. (R. at 73, 87.) He timely requested a hearing before an Administrative Law Judge ("ALJ"), and personally appeared and testified at a hearing held on November 6, 2008. (R. at 93-94, 22-23.) On June 12, 2009, the ALJ issued a decision finding Plaintiff not disabled. (R. at 7-18.) Plaintiff then requested the Appeals Council to review the ALJ's decision in light of newly submitted evidence. (R. at 5.) On May 11, 2010, the Appeals Council denied his request for review, and the ALJ's decision became the final decision of the Commissioner. (*Id.*) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.   Factual History**

    **1.   Age, Education, and Work Experience**

Plaintiff was born on November 15, 1978, was twenty-seven years old on his alleged onset date, and was twenty-nine years old at the time of the hearing before the ALJ. (R. at 135.) He has a high school education and past relevant work as a car washer, order puller, fast food worker, folding machine operator, furniture mover, and electrician's assistant. (R. at 16, 30.)

    **2.   Medical Evidence**

In June 2002, Plaintiff visited East Dallas Health Center ("EDHC") and reported a history of seizures since 1997, with his last seizure occurring three weeks earlier. (R. at 406.) He also reported taking Delantin and Depakote for his condition. (*Id.*) The EDHC care-giver recommended he not drive and referred him to the Parkland Hospital Seizure Clinic ("Parkland"). (R. at 404.) Plaintiff returned to EDHC for a follow-up visit on November 11, 2002, and reported having a seizure a week earlier, anger issues, concentration issues, depression, stress, and feelings of guilt

about his condition. (R. at 399.) The following day, the EDHC care-giver increased Plaintiff's Dilantin prescription dosage. (R. at 398.)

In early 2003, Plaintiff reported to another EDHC care-giver that he was having seizures approximately two days a month, with his most recent one accompanied by urinary incontinence. (R. at 394.) He also reported that he had stopped using Dilantin because it made him feel angry, and Celexa because it made him feel "bad." (*Id.*) He was placed on Carbamazepine and referred to a neurology clinic for further evaluation. (*Id.*)

On June 14, 2004, Plaintiff visited neurologist David Chen, M.D., and reported that he developed seizures after a motor vehicle accident in 1997. (R. at 293.) Typically, when he had a seizure, he began to gasp for air, followed by convulsive events with tongue biting while in a postictal state. (*Id.*) He reported seizures every two to three months and small spells in which he would episodically gasp for air. (*Id.*) Dr. Chen noted that Plaintiff was on Depakote but was occasionally non-compliant. (*Id.*) He suggested an MRI of the head and long-term EEG monitoring to clarify whether the spells were seizures. (R. at 294.) Even though the EEG was negative, Dr. Chen noted on December 2, 2004, that he was "still suspicious" the gasping-for-air spells were "potentially small partial seizures." (R. at 292.) He increased Plaintiff's Depakote and advised him to take extra Depakote on a more routine basis. (*Id.*)

On April 5, 2005, Plaintiff reportedly had a seizure at work while on medication, fell and hit the left side of his face, and was taken to the hospital. (R. at 248.) He stated that he did not remember the seizure but felt tired in its aftermath. (*Id.*) On May 19, 2005, he went to the hospital again after having a seizure. (R. at 270.) He was advised not to drive, swim, climb, or operate machinery. (*Id.*) A physician noted that Plaintiff was not taking Dilantin and Buttrileptal. (R. at 268.)

On August 2, 2005, Plaintiff reported to Dr. Chen that he had begun to develop seizure activity the previous day but had not gone into any convulsive events. (R. at 288.) Dr. Chen noted that Plaintiff was having excessive day time drowsiness, but a sleep study showed only mild sleep apnea. (*Id.*) Plaintiff reported that using his uncle's Valium had helped with the myoclonic-activity and that he was still adjusting his medications on his own; Dr. Chen advised him not to adjust his medicine or take other people's medication without consulting his physician. (R. at 288-89.) On August 13, 2005, Dr. Chen reported that an MRI of Plaintiff's head and long term EEG monitoring were negative, and that Plaintiff had not increased the Depakote as suggested. (R. at 287.) While he noted that Plaintiff had not reported any convulsant seizures, he expressed concern about the episodic sporadic spells in which Plaintiff gasped for air. (*Id.*)

On August 17, 2005, Plaintiff saw Dr. Chen again. (R. at 285.) Plaintiff reported that he was "doing great" and tolerated the Depakote without any problem. He had spells in which he began to shake and could not think clearly but that Valium helped a lot, and his excessive daytime drowsiness had been quite stable. (*Id.*) On August 29, 2005, Plaintiff was taken to a hospital after he was involved in a motor vehicle accident. (R. at 261.) The paramedics reported that Plaintiff veered off the road while driving, probably due to a seizure. (*Id.*) They advised him not to drive. (*Id.*)

On September 15, 2005, Plaintiff was examined by Dr. Chen again, who noted that the increased dosage of Depakote had helped Plaintiff's myoclonic seizures a lot, and that he had not had any seizures since his last visit in August 2005. (R. at 282.) Dr. Chen also noted that Plaintiff self-adjusted his medication and had been advised multiple times against it; he again advised him to follow the recommended dosage. (R. at 283.) His impression was that Plaintiff experienced excessive day time drowsiness but was reportedly doing much better. (*Id.*) Plaintiff's father reported that Plaintiff had been very quick-tempered and quite irritable. (*Id.*)

On September 18, 2006, during a visit to EDHC, Plaintiff reported that he was taking Xanax, Valium, and Depakote for his seizures, had seizures while on Depakote, and had suffered head trauma from one of the seizures. (R. at 380.) Plaintiff was advised not to climb, drive, or do any other risky activity. (R. at 377.) On October 31, 2006, Plaintiff visited EDHC again, this time reporting seizures while still on medication. (R. at 313.) He reported that the seizures started with hiccups at times, and that taking Xanax stopped a seizure from occurring. (*Id.*) Plaintiff was advised to continue seizure precautions and follow up with the epilepsy clinic. (*Id.*)

On December 19, 2006, at the request of the Social Security Administration, Skye Moffit, Ph.D., performed a clinical interview and mental status consultative examination of Plaintiff. (R. at 324-26.) Dr. Moffit noted that Plaintiff's medical record indicated a seizure disorder resulting from a car accident and subsequent head injury in 1997. (R. at 324.) Plaintiff reported that he started hiccuping before a seizure and took Xanax to calm himself down. (*Id.*) He also reported experiencing three seizures a week and often injuring himself. (*Id.*) He stated that he was let go from his job because the number of seizures had increased in the past year. (*Id.*) He denied any symptoms of depression and anxiety. (*Id.*)

By early 2007, Plaintiff was being treated at the epilepsy outreach clinic at Parkland. (R. at 451.) On February 16, 2007, a physician at the epilepsy clinic recommended that Plaintiff be admitted to the Epilepsy Monitoring Unit ("EMU") for an evaluation due to his frequent seizures. (R. at 448.) Plaintiff was admitted to EMU on March 29, 2007, and was monitored for two days. (R. at 424-47.) Upon admission, Mark A. Agostini, M.D., noted that Plaintiff suffered from three types of spells. (R. at 426.) The first type of spell consisted of jerking of the extremities and hiccups that usually occurred every morning and abated with Xanax. (*Id.*) The second type of spell, called the grand mal seizure, occurred two to three times every week, and consisted of an aura of

"difficulties breathing in the brain," followed by a loss of consciousness, generalized stiffness and shaking, and postictal confusion. (*Id.*) The third type of spell occurred once a week and consisted of staring episodes that lasted only five seconds and did "not have a preceding aura or postictal confusion. (*Id.*) An EEG of Plaintiff showed several myoclonic seizures triggered by photic stimulation, "several bilaterally synchronous jerks of his hands and arms" and hiccups. (R. at 427.) Dr. Agostini explained that "the onset in his teenage years, the confirmed presence of myoclonic seizures, the history of probable absence and tonic-clonic seizures, his normal development, normal background EEG and the interictal generalized poly-spike slow wave discharges are all features of juvenile myoclonic epilepsy." (*Id.*) Dr. Agostini diagnosed Plaintiff with generalized myoclonic epilepsy and advised him to continue his regular diet and follow up with the neurology clinic. (R. at 432.) He also advised him to continue taking Depakote, start Keppra, and take Ativan for clusters of myoclonic seizures. (*Id.*)

On June 8th, 2007, Plaintiff had a generalized tonic clonic seizure with vomiting and postictal confusion. (R. at 415.) Medical records from Parkland noted that Plaintiff had not taken his medication that day. (*Id.*)

On September 10, 2007, Cherian Karunapuzha, M.D., answered a residual functional capacity ("RFC") questionnaire regarding Plaintiff's juvenile myoclonic epilepsy. (R. at 408.) He noted that he had one clinic visit with Plaintiff, but other doctors before him had followed Plaintiff in the neurology clinic. (*Id.*) He also noted that Plaintiff experienced myoclonic, absence, and generalized tonic clonic seizures, and explained that the seizures were manifested by confusion, exhaustion, and vomiting, and that stress was a contributing factor to the seizures. (R. at 408-09.) He noted that Plaintiff had abnormal sleep cycles and became extremely tired and slept for hours after a seizure, and that his seizures were under poor control despite prescriptions for Keppra,

Depakote, and Ativan. (R. at 409.) Plaintiff was compliant with those medications, but they caused dizziness, lethargy, and a lack of alertness. (R. at 409-10.) He opined that Plaintiff's seizures were likely to disrupt the work of co-workers and that he would need more supervision at work than an unimpaired person. (R. at 410.) He further opined that Plaintiff would need to take unscheduled breaks during an eight-hour work day for two to three times a week and would need six to eight hours of rest before returning to work. (*Id.*) According to him, Plaintiff was capable of only low stress jobs, because even moderate stress could trigger his seizures. (R. at 411.) Finally, he opined that Plaintiff would likely experience good days and bad days, and would miss more than four days of work per month. (*Id.*) On March 6, 2008, Plaintiff returned to Parkland, where he was ordered to avoid driving, heavy objects or machinery, and high altitudes. (R. at 460-61.)

On October 22, 2008, Dr. Taneja Aanchal issued an RFC assessment based on Plaintiff's juvenile myoclonic epilepsy. (R. at 470.) He noted that he had treated Plaintiff since March 6, 2006, (*id.*), and that Plaintiff had myoclonic or generalized tonic clonic seizures seven to eight times a week and that Plaintiff was compliant with his medication, (R. at 470-71). Dr. Aanchal opined that Plaintiff would not need to take unscheduled breaks during an eight-hour work day and was capable of low stress jobs. (R. at 472.) The doctor further opined that Plaintiff's impairments were likely to produce good days ans bad days and would cause him to miss more than four days of work per month. (*Id.*)

On April 15, 2009, Plaintiff was taken to the emergency room ("ER") after experiencing a generalized tonic clonic seizure that caused him to fall. (R. at 485-486.) According to his medical records, the seizure lasted five minutes, and Plaintiff fell from the chair, hit his head against the table, and knocked it over. (R. at 490.) He reported head and back pain at the ER and also pain in his bilateral lower extremities. (R. at 490, 499.) He reported that the pain in his bilateral lower

extremities was normal for him following a seizure. (R. at 499.) Plaintiff was given Morphine for his pain. (R. at 499.) Plaintiff believed that his seizure was caused by severe anxiety due to the recent denial of his disability application. (R. at 485.) The ER doctor increased his Keppra dosage, recommended that Plaintiff see a psychologist for his anxiety disorder, and suggested that he follow up with Dr. Taneja at the neurology clinic. (*Id.*)

On August 19, 2009, Plaintiff visited the ER again after another tonic clonic seizure. (R. at 511.) The seizure lasted about five minutes, caused eye blinking, rhythmic jerking, loss of consciousness, and biting of his tongue. (*Id.*) Upon a review of his systems, Plaintiff was found positive for malaise/fatigue, nausea, and myalgias of his musculoskeletal system. (R. at 512.)

### 3. Hearing Testimony

On November 6, 2008, Plaintiff, his parents, and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 22-72.) Plaintiff was represented by an attorney. (R. at 22.)

#### *a. Plaintiff's Testimony*

Plaintiff testified that since September 1, 2006, his alleged onset date, he had been suffering once every two months from major motor or grand mal seizures where he lost consciousness, fell on the ground, and began to twitch or convulse. (R. at 37-38.) Every three or four months, the seizures occurred without any warning and resulted in injuries like bumps on his head, tongue bites, and a broken tooth. (*Id.*) His father once had to kick the door down and get him out of the bathtub; he was bleeding. (R. at 38.) During those seizures, he lost all awareness of what was happening. (R. at 39.) After a seizure, he cried, felt scared and tired, and had to go to bed for two to three hours. (*Id.*) Following a major motor seizure, he was unable to do anything for a whole week because his muscles hurt; he also stayed in bed for two to three days. (R. at 39-40.) He lost his job for this same reason. (R. at 40.)

He had absence seizures about once a month, where his parents would catch him dazing off or blinking out for a few seconds, and he would not be able to respond to their questions. (R. at 41.) He also suffered every other day from a third kind of seizure called the juvenile myoclonic seizure, where he awakened while gagging and throwing up. (R. at 42-43.) During a juvenile myoclonic seizure, which lasted three to five minutes, he was aware of his surroundings and did not twitch. (R. at 42-43, 45.) He took Depakote and Keppra every day to help with the myoclonic seizures, but the medication made him sleepy. (R. at 44-45.) Since his dosage for Depakote had been dropped recently, he had been less sleepy. (R. at 45.) His seizures had improved since he had started Keppra. (R. at 46.) Because of his medications, on a typical day, he slept one hour in the morning, three hours between noon and 5:00 pm, and another three hours after 5:00 pm. (R. at 46-47.) He did not use a CPAP or BiPAP machine for his sleep apnea and had not been recommended anything to keep him off his back while sleeping. (R. at 47-48.) He did not drive. (R. at 48.)

### b. Father's Testimony

Plaintiff's father testified that after Plaintiff gagged and coughed during a juvenile myoclonic seizure, he got tired but did not lose consciousness. (R. at 55.) He took medication during a myoclonic seizure to prevent himself from going into a grand mal seizure. (R. at 56.) Despite taking medication, however, he had a grand mal seizure about every two months. (*Id.*) About once a month, the father noticed Plaintiff just sitting there and zoned out, but if he touched him or said something, he would "come on back." (R. at 57.)

### c. Mother's Testimony

Plaintiff's mother testified that she went to the doctors with Plaintiff, but there was a lot of information that he did not want her to tell the doctors. (R. at 57-58.) She never kept a seizure diary because she did not know that Plaintiff had absent seizures until recently, even though she had

noticed his stare-offs. (R. at 58.) She had no idea how often Plaintiff had the absent seizures. (R. at 59.) Plaintiff had more frequent grand mal seizures before he was put on Keppra, and he slept heavily after he took his medication. (R. at 60.) A lot of times, he just got up in the morning and was so tired that he went back to bed again; he could stay in bed all day and would not do anything. (R. at 59.) She testified that Plaintiff had not seen a psychiatrist and had not been referred to mental health services. (R. at 60.)

### d. Vocational Expert's Testimony

The VE testified that Plaintiff had past relevant work as a car washer, fast food worker, folding machine operator, furniture mover, furniture mover driver, electrician's assistant, and order puller. (R. at 70.) The ALJ asked the VE to opine whether a younger person with a high school education, a reading ability of a sixth or seventh grader, and a minimum vocational literacy of a third grader with standard seizure precautions – no driving, no working at protected heights, and no working around inherently hazardous situations such as chemical vats, open fire pits, hot grills, stove tops, and waterways – could perform Plaintiff's past relevant work. (R. at 65.) The VE opined that the he could not. (R. at 66.) If the individual had at least minimal vocational literacy, limited reading and math skills, and was subject to the standard seizure precautions, the VE opined that he could perform other work that existed in significant numbers in the local and national economy, such as that of a dining room attendant, a cafeteria attendant, and a laundry worker. (R. at 66-68.) The VE testified that the maximum customary tolerance for these types of unskilled jobs was two days per month, and the employee needed to maintain attention and concentration for ninety percent of the time to maintain competitive employment. (R. at 68.)

## C. **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on June 12,

2009. (R. at 7-18.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 1, 2006. (R. at 12, ¶ 2.) At step two, she found that Plaintiff's seizure disorder was a severe impairment. (R. at 12, ¶ 3.) At step three, she found that Plaintiff did not have an impairment or a combination of impairments that met or equaled a listed impairment. (R. at 13, ¶ 4.) In her residual functional capacity ("RFC") assessment, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels but with standard seizure precautions, i.e. no working at unprotected heights; no working in inherently hazardous situations such as chemical vats, open fire pits, hot grills, stove tops, and waterways; and no driving. (R. at 13, ¶ 5.) The ALJ found that Plaintiff was unable to perform his past relevant work, but given his age, education, work experience, and RFC, could perform other jobs existing in significant numbers in the economy. (R. at 16-17, ¶¶ 6-10.) She concluded that Plaintiff had not been disabled since the alleged onset date through the date of her decision. (R. at 17, ¶ 11.)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.  Issue for Review**

Plaintiff presents the following issues for review:

1. The ALJ must give controlling or great weight to a treating physician's opinion as to the nature and severity of a claimant's impairments absent good cause or

> inconsistency with other treating or examining evidence in the record. The ALJ failed to provide the required analysis when rejecting two treating opinions. Are the ALJ's findings supported by substantial evidence?
>
> 2. The Commissioner's administrative findings, including the credibility determination, must be supported by substantial evidence. The ALJ failed to adequately consider testimony from Plaintiff's parents and the possibility that a mental impairment exacerbated Plaintiff's symptoms. Is the ALJ's credibility finding supported by substantial evidence?
>
> 3. An RFC finding includes an implied finding that the individual is capable of performing work at that capacity for eight hours a day, five days a week. Is the ALJ's implied finding that Plaintiff is capable of sustaining work supported by substantial evidence?

(Pl. Br. at 1-2.)

**C.** **Treating Physician's Opinion**

Plaintiff complains that the ALJ erred by failing to properly assess the treating specialist opinions of Dr. Karunapuzha and Dr. Aanchal, and that her reasons for rejecting the opinions are not supported by substantial evidence. (Pl. Br. at 9-13.) He argues that the ALJ was under a duty to seek clarification from the physicians if she had any concerns as to the source of their assessments. (*Id.* at 13.) Defendant responds that the ALJ acknowledged that Dr. Karunapuzha and Dr. Aanchal were treating physicians but properly rejected their opinions under the factors outlined in 20 C.F.R. § 416.927(d) for evaluating a treating physician's opinions. (D. Br. at 4-7.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1527(c)(2). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(d). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. 20

C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(d). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(d)(1)-(6).

Here, Dr. Karunapuzha and Dr. Aanchal both opined that Plaintiff could only perform low-stress jobs, experienced good days and bad days, and would likely miss more than four days of work per month. (R. at 411, 471-72.) Both of them also reported Plaintiff's compliance with his medication regimen. (R. at 471.) In rejecting these opinions, the ALJ found that both doctors had reported only limited treatment of Plaintiff. (R. at 15.) She pointed out that Dr. Karunapuzha had evaluated Plaintiff only once, and Dr. Aanchal had reportedly been treating him since March 6, 2008. (R. at 15.) The ALJ found that both doctors had relied quite heavily on, and uncritically accepted as true, almost all of Plaintiff's subjective reports of symptoms and limitations. (R. at 15.) She also found that Plaintiff had been adjusting medication on his own, failed to increase the Depakote as suggested, and suffered a seizure in May 2005, after he stopped taking Delantin. (R. at 15.) A 2005 CT scan of Plaintiff's head showed no acute intracranial abnormality, a long-term EEG performed in 2004 was negative, and MRIs of his cervical, thoracic and lumbar spines done

in 2009 were unremarkable. (R. at 15.)

Although the ALJ may have considered some of the factors outlined in 20 C.F.R. § 404.1527(d), her reasons for rejecting the opinions are not supported by substantial evidence. First, the evidence she relied on to show Plaintiff's non-compliance with medication was pre-onset evidence consisting mostly of medical notes from 2005 by Dr. Chen. *See Carmickle v. Comm'r of Social Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (medical opinions that predate the alleged onset of disability are of limited relevance); *Coffman v. Astrue*, 2010 WL 989055, at *2 (W.D. Ky. Mar. 15, 2010) (medical opinions that predate the alleged onset of disability are not considered substantial evidence). Other than one instance in which Plaintiff did not take his medication, the medical record after the alleged onset date is devoid of evidence that Plaintiff was non-compliant. Instead, Plaintiff was reported as compliant in at least four instances after the alleged disability onset date (R. at 313, 380, 409-10, 471), and Plaintiff and his father both testified at the hearing that he was compliant (R. at 44-45, 56). Even if there was no evidence of compliance in the medical record after the alleged disability onset date, a lack of evidence concerning compliance does not constitute substantial evidence of Plaintiff's non-compliance during the relevant time period. *See Lumpkin v Barnhart*, 493 F.Supp.2d 1199, 1203 (S.D. Ala. 2006) (lack of notations about work restrictions could not constitute substantial evidence to support a finding of non-disability).

Second, in rejecting the physician's opinion, the ALJ improperly evaluated the pre-onset negative EEG results. She ignored Dr. Chen's suspicions that despite the negative EEG, the gasping-for-air spells were potentially small partial seizures. (R. at 292.) She also gave no consideration to an EEG performed after the alleged onset date, which resulted in Dr. Agostini's diagnosis of generalized myoclonic epilepsy and showed several myoclonic seizures triggered by

photic stimulation, "several bilaterally synchronous jerks of his hands and arms," and hiccups. (R. at 426-27.) She further ignored Dr. Agostini's explanation that the onset of Plaintiff's seizures "in his teenage years, the confirmed presence of myoclonic seizures, the history of probable absence and tonic-clonic seizures, his normal development, *normal background EEG* and the interictal generalized poly-spike slow wave discharges are all features of juvenile myoclonic epilepsy" (emphasis added). (R. at 427.) While the ALJ is not required to discuss every piece of evidence in the record, she must confront the evidence opposing her conclusion and explain why it was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The ALJ also did not explain the role of the CT scan and the MRIs in rejecting the doctors' opinions. Although not required to explain her reasoning detail, she was, at the very least, required to build a "logical bridge" between the evidence and her conclusion. *See Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Third, there was evidence that the two doctors were part of the EDHC team and had the benefit of observing first-hand the treatment records related to the alleged disability period, and that Dr. Aanchal had treated Plaintiff since March 6, 2008. Since the two treating physicians' opinions were consistent with each other and uncontradicted by another treating or examining physician's opinion, the ALJ should have re-contacted them to clarify the nature and extent of their treatment relationship and any perceived inconsistency between their opinion that Plaintiff could perform only low stress work and that he would be off four days a month as a result of his seizures. If an ALJ determines that "the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)." *Newton*, 209 F.3d at 453.

Finally, the ALJ's finding that the doctors relied heavily and uncritically on Plaintiff's subjective complaints is in disregard of Plaintiff's lengthy and detailed medical record where his treating physicians consistently noted his symptoms.

The ALJ's decision is not supported by substantial evidence, and the case must be remanded to the Commissioner for reconsideration. On remand, the ALJ should, at a minimum, obtain clarification from Dr. Karunapuzha and Dr. Aanchal about the nature, length, and extent of their treatment relationship with Plaintiff; obtain, if necessary, further evidence or evaluations of Plaintiff's ability to perform work on a sustained basis; and give specific, supportable reasons for rejecting the physicians' opinions. Since remand is required on this issue, the Court does not consider the remaining issues for review.[2]

### III. CONCLUSION

Plaintiff's motion for summary judgment is **GRANTED**, Defendant's motion for summary judgment is **DENIED**, and the case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion.

**SO ORDERED,** on this 30th day of December, 2010.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[2] Plaintiff requests time limits for the Commissioner to take action on his case. (Pl. Br. at 18-19.) He relies on three Fifth Circuit cases that "urge[d]" the commissioner to expedite and give highest priority to the final resolution of the claims and did not place any specific time limits on the Commissioner. *See Parks v. Harris*, 614 F.2d 83, 85 (5th Cir. 1980); *Dudley v. Astrue*, 264 F.App'x 249, at *3 (5th Cir. 2007); *McQueen v. Apfel*, 168 F.3d 152, 158 n. 6 (5th Cir. 1999). He also relies on a Northern District of Texas case, that placed specific time limitations on the Commissioner in a case that had been ongoing for at least fifteen years before the district court rendered its decision. *See Hutchison v. Apfel*, 2001 WL 336986, at * 13 (N.D. Tex. Mar. 9, 2001). Plaintiff has not explained why specific time limits are justified in this case.